Judge Newsom, Judge Karnes, and I are happy to welcome you to the second day of our panel sitting here. A couple of things before we get started. First, we are going to take a break between the second and third cases. So, if you have the third and fourth cases, we're probably going to have a five-minute break in between them. The second thing is that we have our former Chief Judge, Judge Karnes, here by Zoom video conference. So, you will see him on the screen, and he'll be able to participate as if he were here. And, of course, he'll pop up when he asks a question. You know the lighting system. When the yellow light goes on, that means that your time is drawing to a close. So, please start wrapping up. If we take you beyond the red light, then don't worry. You're on our time and not yours. And I think with that, we are ready to begin. And so, our first case is number 19-13926. Those numbers 1 through 976 et al. versus Chiquita Brands International et al.  Good morning. May it please the Court, I'm Paul Wolf for Appellants to O378 and O340. Thank you for allowing me to speak. I think my presentation should only take about five minutes, so there should be plenty of time to answer your questions. I have three related legal issues that I would like to ask the Court to address in its opinion. And then I would like to mention three different categories of evidence that most of the plaintiffs have and keep the legal questions in mind when looking at that evidence. And also keep in mind whether the evidence has probated value or whether it would be admissible, because those are essentially the questions that we have to answer. So, the three legal issues, they're all related, are first, what is the evidentiary standard or the evidentiary threshold or summary judgment? And then the second related to that is whether the plaintiffs must prove causation and negligence by the more likely than not and substantial fact that fits standards. And then tied into both of those is whether circumstantial evidence alone, supported and explained by expert testimony, in this case, a law enforcement officer, the FBI agent who investigated Chiquita in the underlying criminal case, can meet the standard. So, the three categories of evidence that I want to mention, they're very common. Number one is an administrative agency finding. There is an administrative agency in Colombia called Acción Social, which translates to social action. And the role of this agency is to determine which people are victims of war crimes or victims of human rights violations and pay them money. The second category of evidence are death certificates. Related to death certificates are autopsy reports, which I'm considering to be the same because they essentially prove the same thing. And then the third type of evidence are court proceedings. So, court proceedings are entitled to presumption of regularity, as are any act of the Colombian government. And it's an issue of comity whether we recognize these official acts and official documents of the Colombian government as evidence. And then, again, we have to look at whether the evidence is quoted and whether it's admissible. I feel that this evidence was swept under the rug by the district court, and I'm having difficulty getting heard in the district court. And for that reason, I appreciate the time today. So, the first exhibit that I want to draw your attention to is Founded Appendix 143 to 145. And that is an English translation of an administrative agency determination by Acción Social. So, it cites laws and facts, applies the laws to the facts, just as a court decision would. And the plaintiff was summoned and had to appear for this. It ends in an order, which is at Appendix 145. The order is to recognize and grant the status of the victim of violation of human rights to the plaintiff, 1378. She was paid money. So, I want to emphasize that money is substantial. And if someone is paid money, that should create a plausible inference. And that's why I think that… But, Mr. Wolf, this is Judge Jordan. An inference of what? The question, I guess, in this person's case is not whether or not she or a relative was a victim of a human rights violation. But for purposes of the appeal in the district court's order, at the hands of whom? So, what do you think is the fair inference to be drawn from that document, assuming its admissibility? Well, she did accuse the AUC, the paramilitaries, of committing the crime. And throughout the three-page letter, the agency refers to them as paramilitaries. But there's no issue as to which paramilitaries it were. It used to be Akebananero, or the banana growers' block. And so, the War Crimes Tribunal and the agency are all organized around the units of the AUC that committed the human rights violations. So, the letter refers to a very specific unit of a group that was paid by Chiquita at the same time the crime occurred. So, that's the causation, that's the causal link. It's geographic, so the crime occurred near where Chiquita's banana farms were located. But also, Chiquita wasn't just paying this group, it was paying a local unit of the group to commit the murder. So, yes, this letter does recognize that the Auto Defensas Unidas de Colombia, or AUC, committed the murder. And in the analysis, it looks at a book, it looks at a website, which means Open Truth, and other academic sources to determine, basically, where the paramilitaries were at that point in time to confirm that they did control the area when this claim was made. So, this is admissible, all these documents are admissible as business records. This document is additionally admissible as a public record because it sets forth the findings of the AUC. What is the specific provision, the rules of evidence, that you think this document best fits under? I think it's a public record, Your Honor. I think it's 8038, but it also could be admissible as a business record. And so, we have Mashankov v. Attorney General, 676 at 3962. That's the 11th Circuit case about Ukrainian police and medical records. We have Riggs National Court v. Commission in 295 at 316 B.C. Circuit, which is about official tax receipts. The other plaintiff, Doe 840, received a less detailed letter, but she did receive about $3,000. The second category of evidence is the death certificate. The death certificate shows a time and place and a manner of death. This is correlated with what is known about the campaign because the paramilitary campaign has been well documented in many years of war crimes tribunals. And if we can show that a person died, for example, by a gunshot wound in a time and a place where the AUC paramilitaries had exclusive control, that should be enough to put a material fact into doubt. I thought that that really wasn't an issue. I mean, at the district court's order, whatever you may think of it in totality, laid out exactly how these bellwethered decedents had been killed, for example, by shots to the head or by being slashed in the throat or the like. You think the district court excluded that evidence? It didn't put any weight on the evidence. So if a person died by a gunshot wound to the head, or in the case of Doe 840, the autopsy report shows eight bullets to various parts of the body. And this happened in the middle of the counterinsurgency campaign when thousands of people were killed. And it happened exactly at the time and place where only the AUC could have done it. How do I know that only the AUC could have done it? Well, for that, we're using Manuel Ortega. He is the FBI agent who was in charge of the criminal investigation of Chiquita. And I believe that he was really shortchanged. He was treated as if he were a university professor who just studied the situation from afar and should have come up with a more scientific method. But he's actually an experienced... But, counsel, that has nothing to do with the admissibility of the death certificate. Judge Jordan's question, and I had the same question, is the district court found the cause of death, as I understand it, consistent with all those death certificates. So why are you talking about whether they were admissible or not?  That should be a given that it's admissible. The question is, what does it prove? So the probated value is... Well, it can't prove anything beyond the contents of the record. The record itself speaks for the contents. And the question is, didn't the district court find all the facts that you were saying the document itself reflects? That is, the cause of death and the name of the decedent and the date. I would have to re-read the opinion, Your Honor, to answer your question directly. But it was not enough to survive summary judgment. So if a person was killed in a manner that was consistent, and other circumstantial evidence supports it besides the expert, we have witnesses who can testify about things like uniforms, machine guns... None of which is in the death certificate. No, Your Honor. Okay. Okay, Mr. Hoffman, Mr. Wolf, thank you so much. You've saved your two minutes for rebuttal. Mr. Hoffman, we'll hear from you next. Thank you very much, Your Honor. And I appreciate your allowing us to appear by Zoom. Your Honor, as I briefly added in considerable detail, we believe there are multiple sources of evidence that would enable a jury to find that it was more probable than not that the AUC was responsible for each of the Bellwether deaths. My part of the case involves 10 of them. With the court's permission, I'd like to focus on the justice and peace process and the justice and peace documents that were excluded by the trial court. The justice and peace process was set up in response to the AUC's campaign of mass murder and terror, a big portion of which is covered by the allegations in this complaint and the deaths of the many thousands of plaintiffs that are involved in these multidistrict litigation proceedings. And the whole system, and it's part of the judicial system in Columbia, part of the law, is based on confessions by mainly former AUC commanders and killers. And they have to be verified by prosecutors and investigators. It is not enough that someone confess. Prosecutors have to verify the connection to the killings in question. That was laid out. Mr. Hoffman, do you think that for evidentiary purposes, what we would refer to as indictments in the United States mean the same thing as the ultimate documents of conviction or sentences, the condenas? I think that there are differences between the sentences and the indictments. And if you'd like, I can start with the indictment. And the main one is record 138 having to do with the former AUC commander, Hasbun. And in that appendix to that indictment, there are four of the 10 bellwether decedents in the cases that I'm handling for which Hasbun has accepted responsibility and confessed and where the prosecutors under the system in Columbia have verified those confessions. And so the indictment is a little bit different than our system in the sense that it is much more a public record that includes factual findings pursuant to a lawful investigation in that the prosecutors are required to investigate. Confessions alone are not enough. And so as Professor Sanchez's explanation of the law indicates, you couldn't have that indictment. He explains what the indictment is, how it fits into that system. And you can't have it without both the confession and verification. And that is enough as a public record, particularly in the absence of any contrary evidence from Chiquita about the lack of trustworthiness, which is their burden, to establish that at least for these four decedents, there is evidence that the AUC was responsible for their murders. Even more appropriate to take in as evidence or even more established in a sense is the sentenciates, which apply to four other of the 10 decedents, where in the Mangones and Randon sentencias, those are identified as the victims of AUC killings. This is Judge Newsom. Can I ask you a quick question about the sentencia, at least of Mangones? It seems like the relevant portions of that document, that sounds a lot more like a definitive judgment than an indictment, but I can't quite tell that the relevant portions or excerpts tell us anything about the judgment. It seems like the excerpt that we have lists the accusations and the charges, but not the findings. Well, Your Honor, in the motion for request for judicial notice, there's a more extensive copy of the sentencia. As we've indicated, the sentencia is a public document. It's over 1,000 pages, and it goes into considerable detail about the background, about the facts relating. But the key point is that the essential factual finding in every sentencia, and including this one, is that the AUC was responsible for the particular killings listed in the sentencia. That's why we put the excerpts in there. So just so I'm understanding, so without respect to the judicial notice issue, is the point that the excerpt for the sentencia that we have, at the very least, function like an indictment? Because they don't. No. I'm sorry, Your Honor. Go ahead. They're a conviction. Mangones and Rendon were convicted of all these killings. Yeah, I just want to make sure that the excerpt that we have, without respect to the judicial notice aspect of this, show the conviction or do they just show the charge? They're part of a conviction. They're part of a larger sentencia in which these people were convicted of these killings. Was the entire sentencia put before the district court? I don't believe that the entire sentencia, the over 1,100 pages, was put before the court, but it is available publicly on a website, and that site was given to the court. So in other words, the defendants have had it and have relied on it in the past in other motions in the case. You know, there is an issue regarding the procedures by which the court evaluated evidence in the sense that many of the objections to the justice and peace documents were made late in the process before the plaintiffs had an opportunity to respond and the trial court limited that response. Part of the reason for the request for judicial notice is an additional response because the plaintiffs really didn't have that opportunity and didn't know that the sentencias would be challenged by the defendants and their reply papers. I think the main point is that these are convictions and under 80322, they can be made admissible. For example, there's no doubt that there's an 1,180 page judgment of conviction that has to do with that involves these four bellwether decedents that can be made admissible in any form the trial court wants in the full form, in a full translated form, in any form the court wants, but it's there. There's no doubt. No one disputes the fact that these are judgments of conviction and that they were entered by a Colombian court and that they are entitled to be admitted under 80322. I guess the difficulty, and I don't want to hijack your entire argument on this issue for sure, but the difficulty I'm finding is that you're asking us to conclude that the district court abused its discretion with respect to a piece of this document. And I don't think that that piece of the document was highlighted for the district court. You've asked in your, in your request that we take judicial notice of it. For us to take a look at another piece of the document. But I think the piece that you highlighted for the district court. Wasn't for, you know, sort of, if I'm understanding the process correctly, wasn't really the judgment piece. It was the charge piece. Well, my understanding is that in the, in the. Excerpts there were, I know there was one.  that was the only decedent that I think was left out of the excerpt. And that's. Can. Franklin. I think was not. And the lawyer in that case filed a rule 60 B. Motion and corrected that. And, and. I think that was the case. And we did. And one of the reasons for the request for judicial notice was to show, among other things that. The courts decision that this could not be made admissible by trial. Which is really the central issue, right? Because what. Apart from whatever issue. There's no doubt that the conviction exists and it's public and everybody had access to it. And so the question was, can you get it certified in time for trial? And he said, well, the question is, can you get it certified? In time for trial. And we. The answer to that is yeah. There's a process to get. Official documents and Columbia certified. Many of the documents in the case now. Are subject to an app. I post deal or certification. We're able to show that in the request for judicial notice. You know, and one, one of the other issues about the justice and peace documents is that. The justice and peace documents. We're also relied on by. The experts, all the experts. Had access to. The confessions, testimonies, sentences. In order. Clearly. The. The admissible forms of evidence. That form the basis for their opinion about the modus operandi. The BAUC. The manner in which you kill people. It's complete control of the areas and the localities where these feelings occurred. The fact that the AUC. It's open and notorious control. Engaged in gruesome forms of killing to send a message to terrorize. The local population. It's open and notorious control. I mean, it's as if the mafia controlled large chunks of. Of us. States. Open and notorious. Let me interrupt you for a second. I think that's a good step. To one of, one of the arguments you make in the brief. Is that. Even if. The district court got all of the evidentiary rulings. Correct. There is still a material issue of fact with regards to some or all of the bellwether disease. On the issue. They were killed by the AUC. Can you please. Elaborate on that. Right. There was, there was a. A lot of additional evidence. To the deposition testimony of AUC commanders. That were taken in the case, the deposition of Chiquita. Deponents. Documentary evidence. The expert, the other parts of expert reports of professor Carl and Robin Kirk. And Kaplan. I think there's a lot of additional evidence. To the deposition. About. The motive of the AUC. For which, by the way, any limit on modus operandi evidence doesn't exist. The. Complete control in these areas. The fact that it was open and notorious control. It wasn't secret. They were around exercising their control every day. They excluded other groups. So the, the district of courts speculation that there might've been some other warring factions. Is inconsistent with the evidence and not supported by any evidence at this point. That. Stronger, I guess your stronger point on that. Particular ruling. Assuming the district court were right. That there are other explanations. As to who killed the bellwether decedent. Your point is that there's at least enough evidence on your side of the ledger. To create an issue of fact for a jury to decide the question. That's exactly our point. There's a mountain of evidence by which a jury could find. That these bellwether decedents were killed. By the AUC based on all of these different circumstantial evidence, putting aside the direct evidence of the sentence. And the, the indictment and the justice and peace documents and the defendants argument that in order to show. In order for this to be enough, you'd have to exclude all other possibilities. That's not our burden. Our burden is to show enough evidence that a jury can make that finding they're entitled to make whatever argument and introduce evidence to say that that's not what happened. But we, it seems like the trial court was putting a burden on us to conclusively prove, almost to prove beyond a reasonable doubt that the AUC was involved in these, in these killings. That's not our burden. And there was plenty of evidence for a jury to find that the AUC was in complete control that it killed people exactly these ways. That there was a reason why they did it that they targeted certain people like unionists, banana workers, certain other categories. All of which are, you see this fall into that was enough. And the court. Yes. I understand that argument. It seems like a strong one. May quite frankly, that was. An inclination that I want to explore an argument about it, that all these evidentiary issues may be beside the point for purposes of summary judgment. If you have sufficient evidence otherwise, but talk to us about this, this, these are bellwether cases. And there are either hundreds of thousands of cases, depending on which part of which brief you listen to and read. That if we don't decide these evidentiary issues about the documents, it goes back and the district court rules the same way it ruled before. And your clients or other clients, lose we'll be back here again on the evidentiary issue after a jury trial, only. Very possibly your honor that, that there, one of the reasons that we presented our brief, the way that we did in terms of dealing with the larger issues, in addition to the fact that we thought there was enough evidence separately. Was that these are bellwether cases. These are issues that are going to recur. I think that the trial court probably as much as we would like guidance from this court about the admissibility of justice and peace documents. So in other words, whether this particular excerpt was the appropriate way to do it, it's clear that the convictions can be in future bellwether cases. If this court says, well, you have to translate 1180 pages or, you know, you have to do this, you have to do that, then the plaintiffs will do that. And the truth is probably the majority of the plaintiffs in all these cases. Are covered by a sentencia or will be covered by a sentencia. We haven't, I haven't done the analysis to see exactly the number and the plaintiffs, but it's a large number. Hundreds of feelings. What do you mean will be as opposed to our, Is that, is it still an ongoing process as to some of the plaintiffs? I think that the justice and peace process is an ongoing process. For example, I don't believe that the husband indictment has been turned into a sentencia yet, but it's almost certain that it will be. And so in the course of this process, it seems highly likely that the vast majority of the plaintiffs in these cases will be covered by a conviction that deals with the issue. Now, on the other hand, it also is the case. And to go back to where we started your honor. There's a, there's just a lot of evidence. Beside the sentencia or within the sentencia or the experts relying on the sentencia. About motive control, you know, all of the elements that would give a jury the ability to decide that it was more probable than not that the AUC committed these murders. And that's just traditional. I mean, it seems to me, that's just the traditional way that you prove a circumstantial case. I understand. And you may be right about that, but I'm focusing on the documents now, because whenever you say 1180 pages of translation, it gets my attention. I'm sympathetic for the district court and the ultimate gravity of life as they say. But the problem with us ruling on that now is we would be ruling on whether there was an abuse of discretion or other error based on the exit. And that wouldn't, I don't believe if we send it back on the theory, you're talking about is you're entitled to, to have the summer judgment motion denied irrespective of those documents, but we send it back and say, Oh, by the way, it was an abuse of discretion to exclude these documents as well, or factor that into our decision. Or it wasn't an excuse me. It wasn't abuse of discretion. Then you go back and you get the translation for the entire document. And we haven't made any progress on those evidentiary issues because if the district court then denies admission based on the entire document, and you lose a verdict for a jury, we'll be back up here. Well, I'm not sure because if, if, if this court rules, as I think it should, that there's enough evidence in the record besides the evidence to get to a jury on the issue of AUC responsibility, then it's, it's, that issue is out of the case, which is. No, no, no, no. It isn't because you get to the jury, you offer the evidence again, because getting to the jury is not your ultimate goal. Right. And the district court says, no, I'm not going to let that evidence in. And you've got 180 pages added to it in an individual case and he doesn't let it in and you lose before the jury. You're going to be up here saying that was an abuse of discretion. I understand what you mean. But one of the things that I think as a practical matter would happen, your honor, is that if this court reverses and says, there was enough evidence in this record for a jury to decide AUC responsibility based on admissible evidence of whatever kinds, I think that the trial judge would engage with us about how to present the sentencing in a way that he would accept. For example, at this point he had doubts about whether the sentencing could be made, but I think those doubts are largely over now. And so I think, in other words, I think the judge is, is a very practical person confronted with a difficult set of evidence. And I think what he would do is he would engage in a practical way about how to make sure that the justice and peace documents were, were certified. And that would solve that problem. I don't have any doubt that the judge would respond, you know, in a way to that kind of ruling that would eliminate that problem. You know, I'm not going to say it's going to eliminate all problems because that's never going to happen. Okay. Mr. Hoffman, thank you. We've taken you a little bit beyond your time, but we thank you for your responses. Same for Mr. Wolf and Mr. Hoffman, you've saved your five minutes for rebuttal. Thank you. So, okay. We're ready for the other side, Mr. Chofi. Good morning, your honors. Allow me to introduce my co-counsel and partner, Frank Dante. Today, together we represent Chiquita and the individual defendants. Let me begin by addressing a couple of themes or key arguments that our opposing counsel made. The first one is that somehow the district court judge swept evidence under the rug or that he applied an unfair burden to the plaintiffs. Nothing could be farther from the truth. If you look at the district court's decision, 73 pages in which the trial judge meticulously looked at every piece of evidence, applied the appropriate rules, applied and considered the permutation of various rules, whether it was 803.22 or 803.6 or 803.8, all of these permutations that they threw at the district court judge and at us as the defendants, the district court looked at everything and he gave a thorough analysis. There's no doubt in my mind, Mr. Chofi, that the district judge did a really, really good job of laying everything out and going through everything. Having said that, I'll tell you what my impression was and I speak only for myself and not for my two colleagues. The burden on this issue that the plaintiffs bear is to show that a reasonable jury could find by a preponderance of the evidence that the AUC was responsible for some or all of the debts of the Bellwether decedents, right? Correct. Okay. You can make that sort of showing by circumstantial evidence. And again, this is just, I haven't gone into a deep dive of the record. The record is massive and that's something that one of us, all of us are going to have to do. I have not done that. So I say that as a limitation on my question to you. But it seems to me that there is, to use a rubric from Title VII cases, there is a mosaic of evidence here from which a jury could find that the AUC killed these people. Putting aside all of the excluded evidence, you've got the two so-called experts about the modus operandi of the AUC. You've got the way that they were killed, the cause of death. You've got the eyewitness accounts about how some of the decedents, and I'm not saying this globally for all of them because it's all, it's going to be an individual determination for each Bellwether decedent, how some of them were picked up, for example, on motorcycles, by men wearing masks or helmets. The complete control of certain areas by the AUC, their method of terrorizing. You think about that sort of mosaic. Why couldn't the jury find that by a preponderance of the evidence as to at least some of the decedents? Because, Your Honor, it's a mosaic of allegations. It's a mosaic of rumors. It's a mosaic of hearsay. No, no, no, no. Yes, sir. No, no, not all of it. I am, for purposes of my question to you, I am accepting every single one of the district court's evidentiary rules. I'm accepting all of that. So everything the district court kept out, I agree for now, should have been kept out. But you had parts of the expert reports that were not kept out, right? I disagree with that. You think he excluded the expert reports completely? He did, but I'll address the concern you're raising, Judge. You think he kept out everything, even as to what the AUC was and how it operated? He kept out the part about the responsibility for the killings, but he kept out the testimony from the, I refer to them as experts, maybe you refer to them as something else, about how the AUC operated within certain geographical areas in Columbia. He kept that out too? Yes, he specifically addressed that. That's why I'm saying these are allegations, Judge. He addressed specifically the statistical evidence that both experts, Ortega and Kaplan, put forward. I'm not talking about the killings. I'm talking about evidence about the AUC's operations in geographical areas generally. You're telling me that you think the district court kept that out too. I'm not talking about the AUC killing people or the percentage of killings. I'm talking about how the AUC operated as an organization and in what geographical areas of Columbia it exercised huge amounts of control. That was kept out too? Huge amounts of control, I would say, was kept out, and there's no evidence of that. In fact, what the evidence is, Your Honor, is that... Counsel, counsel, didn't some former AUC members testify to how dominant the organization was in various areas? Didn't they say we totally 100% controlled them? No, they didn't say that, Your Honor. In the depositions, what they said is that they had military force and power, but what was going on inside Columbia... And were the dominant group in that area during a certain period of time where some of these murders took place? Isn't that their testimony? No, Your Honor. If you look at Mancuso's testimony, for example, he said... I don't want examples. I want you to tell me that no one testified to that so when I can go back to see if I misread that part of the case, I can hold you responsible if I didn't. No one testified that during the time of any of these 12 murders, AUC was the dominant group and controlled the area in which the murders took place. Your Honor, what they testified to is that they were a powerful military force. They, as narco-terrorists, they sought to dominate these territories so that they can... Did they or did they not testify that at the relevant time it was the dominant terrorist group in a particular area where a particular murder took place? No, Your Honor, they didn't connect it that way. Absolutely not. And the district court considered that. He considered that argument and specifically found that piecing together this idea of control, which is an allegation, they're not facts, and the modus operandi evidence, Judge Jordan, that you were talking about, wearing masks, killing people with motorcycles, on motorcycles, killing people, as the plaintiffs say, with long and short guns, all of those things are what was going on in Columbia in this conflagration that lasted really for 40 years and may still be going on. Judge Carnes, there were warring factions of groups. The AUC, the FARC, the ELN, the Cali Cartel, the Medellin Cartel. They were all fighting each other and killing hundreds of thousands of people. The military was trying to control the situation and fighting all of them. That's what the testimony is in this case. There is no testimony that one group dominated everything. There's no testimony to that effect. There are only allegations. The modus operandi evidence was excluded by the trial judge. Again, if you apply the abuse of discretion standard, which this court knows is very limited, is highly differential, the district court is allowed a zone of choice. I respectfully submit to this panel that consistent with your jurisprudence, you will not reverse the district court's evidentiary findings even if you would have gone the other way. Okay, Mr. Chauffeur, I may be misunderstanding the district court's order, so I want you to help me with that, please. Yes, sir. Okay, so you have the order with you? Yes, I do. Okay, let me know when you've got that ready. I have it, sir. Okay, so page 63. The district court addresses the testimony of the expert presented by the non-wolf plaintiffs, and then on the next page, the testimony presented by the expert of the wolf plaintiffs. Correct. The district court goes on, on pages 64, 65, 66, and through 67, addressing that testimony on its merits. Correct. Not excluding it, but saying because it believes that it relies on a mistaken theory of market share liability, it doesn't create a triable issue of fact. That's the sort of evidence that I thought the district court engaged with on the merits and said this is not enough. And that's why I think Judge Carnes and I are confused about your statement that all of this expert testimony was kept out. I agree that some of it was kept out. The ultimate causation was kept out, but this testimony about what the AUC was, how it operated, where it operated, how much control it generally had, what its general modus operandi was, these pages indicate to me that the district court engaged that on its merits. Am I mistaken? Well, absolutely. The district court did engage it on its merits and excluded the modus operandi evidence. Okay, fine, take the modus operandi out. What did the district court do on these pages? Did it not take the testimony of the experts, the parts that were not excluded, and then say, okay, this is what you've testified to, expert for the wolf plaintiffs, expert for the non-wolf plaintiffs, still not enough. Didn't the district court do that? The district court did that, but based on its evidentiary findings that the modus operandi evidence was not admissible evidence. Great. If you take that out... Great. So there is evidence that the district court accepted as appropriate at summary judgment from the experts about the AUC's operations, right or wrong? What the district court accepted was that the AUC was one of the warring factions. And let me direct... Just that? Yes, sir. Let me direct you to a couple of persons. I don't see how you get that from pages 61 through 65, because the district court painstakingly goes through the testimony of Mr. Ortega and of Mr. I think it's... I forget the name of the other expert. So Kaplan and Ortega. It painstakingly goes through that testimony. The statistical evidence on crime, the paramilitary homicide rates, the paramilitary behavior in these regions of Colombia, the data drawn from databases organized by the Human Rights Watch, Amnesty International, the Colombian Commission of Jurisdiction, the United States State Department, the United Nations, et cetera, et cetera, et cetera. The temporal overlap. You're telling me all that evidence was excluded? Well, first of all, I'm telling you all of it was hearsay and didn't need any exception. You can make that alternative argument for affirmance. I get that. It's not a problem. That's appropriate for you to do. I'm asking you whether you think the district court and these pages excluded all of that testimony from the two experts. Yes, let me direct you, Your Honor, to page 66. Okay, go. The notion that circumstantial... And this is at the top, first full paragraph. The notion that circumstantial geographical and temporal evidence may support an inference of an AUC-based killing in each of the cases here at issue under a market share reminiscent theory of causation is summarily rejected. This evidence is simply far too speculative, standing alone to permit a reasonable juror to conclude, more likely than not, that the death of any decedent was linked to AUC operation. I know. That's exactly... That's American. That's not excluding the evidence. He said the evidence is insufficient to get to a jury. Not that I'm not going to consider it. Not that it wouldn't be put before a jury, but that it's insufficient. Therefore, it's summary judgment. Can't you make that distinction? Well, Judge, if I could, please. If you look at it, the evidence is far too speculative. A trial judge has the right to... That is different from not admitting that evidence for purposes of summary judgment or for purposes of trial, if you get to trial. Too speculative to support a verdict or support the denial of summary judgment is not inadmissible. In ruling on what evidence a judge considers at the summary judgment phase, the trial judge is certainly within his zone of choice to exclude speculative evidence. But do you hear the questions that are being asked? When the judge said, this evidence standing alone is simply too speculative, that's not a judgment about admission or exclusion. It's a judgment about the sufficiency of this evidence, comma, standing alone, comma, to support the judgment. All right. Yes, I understand that. Do you agree? Well, my position is that the judge did exclude that evidence as being speculative. But may I go on? Counsel, evidence is not speculative. Conclusions are speculative. You have a major premise, a minor premise, and a conclusion. The minor premise, major being the law, minor premise being the evidence. Minor premises aren't speculative if they are proper evidence. And those were evidence. They may call for a speculative conclusion. They may have primary effect that results in speculation. But the evidence itself is not inadmissible as speculative. I don't see any point in spending any more time on that. I mean, we're talking law school first or second year evidence here. And I'm just going to tell you from what I hear from my colleagues, we disagree with you about that. Now, let me ask you something else. Putting aside that, appendix 3620, 3625, 3628, didn't a former AUC member, actually more than one, testify to the control of Uraba? Didn't one of them, who is a commander of certain AUC blocks, refer to the AUC as being a de facto state at the time of some of these murders in the area it controlled? And he said it was, quote, much more of a presence than the forces of the government in some territories, end of quote. And didn't he describe how the AUC drove the guerrillas out of Uraba and into the mountainous area? And didn't another former AUC member, at 3806, testify that in Uraba the AUC, quote, had the zone literally under control, and another one said the control was 100%? Was that evidence not presented? That evidence was, Your Honor. But when you read it in the context of all the depositions, which is what the trial court did, there's evidence that all of that was said in the context of the AUC being one of the warring factions. And if I could go on. 100% control is inconsistent with being merely one of the factions. And a de facto state subject to AUC control is inconsistent. It seems to me like you're denying the undeniable, which is not a very effective advocacy strategy. Your Honor, that's not what they said. That's not what I'm doing. The point the district court made is that there were these warring factions. And if I could continue, Judge Jordan, going back to your question, I'll point this out. But the district court can't say that a jury couldn't find anything other than that there were warring factions. If there is testimony, not hearsay, but testimony that the AUC controlled 100% and was a de facto state, the district court doesn't get to decide credibility issues and sort through the evidence. It's the same rejected state. Your Honor, if I could point to the judge's evidentiary rulings, maybe this will make it clear. On page 66, the paragraph after we were looking at Judge Jordan, turning to the admissibility of the specific case-based evidence as an independent premise for inferring an AUC role in each death, plaintiffs notably do not induce any specific evidence distinguishing AUC methodologies from brutalities committed by other terror organizations, military operatives, narco-trafficking criminals, or common criminals operating across Columbia during the time frames in question. Without such distinguishing evidence, the court finds no basis for admitting the proffered AUC methodologies as modus operandi evidence under Federal Rule 404B, from which the AUC's involvement might be inferred. If the evidence is just as likely to show that it was somebody else as it was to show that it was the AUC, and either of those two hypotheses are reasonable as a matter of fact, why doesn't the jury get to decide amongst them? What the judge is ruling here is one side of that equation is not admissible. In other words, this modus operandi evidence that supposedly links the AUC to the death of these decedents is not admissible. And that, Your Honor, is within his zone of choice. It's not admissible. So all of the questions that have presumed that this modus operandi evidence is admissible, it's not admissible. You understand, of course, Counsel, that we ask you about control and them being the dominant group, which makes it more likely that any of these crimes that occurred there were committed by them, at least gives a more likely than not. And then you shifted to methodology. Methodology is different from dominant control. But, Your Honor, can I also address the control issue? Sure. And the plaintiff's own expert, Mr. Ortega, and this is at the bottom of page 64, as the court says, he cites the government data bank as source evidence of the proposition that of a total of 16,346 incidents of selective assassinations committed between the years 1981 and 2012, producing 23,161 homicide victims. 38 were committed by paramilitary groups. That includes the AUC and other groups, Your Honor. 16.8% by the guerrillas, 27 by unknown groups, 10% by the Colombian military, and 6.5% by unknown individuals. The judge looked at this evidence and, in light of that evidence, ruled, quite appropriately, that there was not sufficient evidence of dominance in light of this. So, just so we're clear, did you hear what you just said? Ruled that there was not sufficient evidence of dominance. I think this goes to Judge Karn's question. Is this about sufficiency or admissibility? If it's about sufficiency, then why isn't this a question for the jury? Well, the issue then becomes what does a reasonable jury infer from the evidence? And what the trial judge held, quite appropriately, is that when you look at the fact that there is no modus operandi evidence, when you look at the fact that only 32% by their own experts' admission were possibly killed by paramilitaries and 68% by other groups, when you exclude all the other evidence, for example, the sentencias, the other documentary evidence, which clearly should have been and was excluded, that what's left, to use Professor Wigmore's metaphor, in this wall of proof is a brick or two. And that that's simply not sufficient for a jury. All it allows is for a jury to speculate. Let's switch to another issue then. Tell me what the evidentiary problem is with the sentencia. Well, there are several. First of all, the trial judge discussed the evidentiary problems extensively. So with respect to 803.22, the trial judge clearly pointed out that that rule does not allow admission because there is nothing in the document itself that suggests that it's a final judgment. Why would it not be a final judgment? Because there's nothing in the document that says it is a final judgment. What is a sentencia under Colombian law? Well, what the trial judge said, and said appropriately. I'm not asking you what the trial judge said now. My question to you is, as an advocate, what does Colombian law say a sentencia is? My answer, Your Honor, is the same answer of the trial judge. There's no evidence in the record as to what that means. And for that reason, the judge said, Apply 803.22. There was no final judgment. There's no adjudicative findings. There's no finding that an unknown perpetrator was identified and that that unknown perpetrator, his affiliation, was also identified. That goes to whether or not the document is probative of anything. But 803.22 says the judgment was entered after a trial or guilty plea. Was it entered after a trial? No, there's no evidence of that. Absolutely none. What is the justice and peace process? Well, this is the real disconnect. The justice and peace process is not the equivalent of a criminal trial. The justice and peace legislation was a reconciliation and reparation piece of legislation. It was designed to allow the former paramilitary to lay down their arms for the leaders to accept general responsibility. There is not in justice and peace any specific finding of who killed which victim. I'm just answering, but Your Honor, it's apples and oranges. The justice and peace is not a criminal conviction. Well, can I ask you a quick question? Even if it's not a criminal conviction, why wouldn't the same documents that we're now talking about in 803.22 terms not be admissible under 803.8 as public records? Well. Factual findings from a legally authorized investigation. Why wouldn't – I mean, it seems like that might cover the indictment. It might cover what you call sort of defective sentencias. If it's short of a conviction, it might nonetheless be a public record. Again, as the district court found, that there are no adjudicative findings in this sentencia. But does 803.8 require adjudicative findings or just factual findings? Well, factual – there are no factual findings here. There are no factual findings at all. Isn't there a finding even in the – even if it's a defective – the excerpts are not complete, isn't there a finding that the prosecutor at least determined, found, enough to charge? Well, enough to charge. But, of course, under Cox, indictments are not – Was Cox considering a hearsay question? I don't recall, Your Honor. I think the answer is no. I mean, an indictment – this seems to me it goes to the trustworthiness prong of 803.8, not the sort of a threshold factual finding issue. It seems to me there is a factual finding, and then you can debate whether it's trustworthy. When you look at the trial judge's analysis, it's exactly right. You can't make a determination that it was a final judgment of conviction without any indication in the sentencia as to what it was. So, for example, as the court was pointing out a little bit earlier, for the Mangona Sentencia, at Appendix 4291 to 4296, they submit six pages of a 1,170-page document. Three of those pages consist of a cover page, two pages of table of contents, and only three pages of text. There's no factual finding to go to your 803.8 question, Your Honor. There's no – Not even of a charge. Just so I'm clear, not even of a charge. Well, there's a charge. And that's not – That's not a factual finding. Not even of a prosecutor? That's not a prosecutor's factual finding? Well – I wonder if we're collapsing 803.8 and 803.22. This is my question. They overlap in the sense that, well, as the judge pointed out in the evidentiary findings, that something's not admissible under 803.22, it can't be admissible under 803.8. So why don't we – maybe I'm just not understanding this, but, like, so if 803.8, factual findings from a legally authorized investigation, requires an adjudicative finding, what extra work is 803.8 doing? You are collapsing it, Your Honor. So 803.22 requires an adjudicate finding. Fine. Right. 803.8 doesn't, but it requires factual finding. There's no factual finding. I mean, of a – There's a charge. A charge. Is that not a prosecutor's finding that there is probable cause to charge or whatever? It's a charge. Your Honor, if you had a – not an indictment, but if you had a report by the Colombian Attorney General's Office that said, we find X, Y, and Z, these AUC commanders were responsible for the deaths of these bellwether decedents for these reasons, but for political reasons and the tranquility of our country, we're going to put this horrible episode behind us and we're not going to charge anybody. But these are our findings after a five-year investigation. Is that admissible under 803.8? Well, it sounds like your hypo assumes that the criteria of 803.8 are met, that there is a factual finding. I know. Okay, but, I mean, if the criteria are met, then the criteria are met, Your Honor. That would be met. I think your hypo assumes that it's going to be met, and I would agree. How is an indictment issued by a charging body in Colombia by the prosecutors different than a report? Well, because this is a snippet of a 1,170-page document that doesn't make that – doesn't have the kind of findings that you're talking about. So your point is not that a sentencia can't, or an indictment can't be admissible. Your point is that as it was presented to the district court, it's not admissible. Am I right about that? Well, certainly the latter is true. Absolutely. It's only the latter. Well. In other words, if you go through the trouble of translating in a certified way all 1,100 pages of a sentencia, and the sentencia is a final adjudicative judgment, okay, of conviction. And I know I'm assuming things, but assume them for the purposes of my question. Is that document admissible under 80322? If it's a final judgment, and if it says, yes, this person has, through the justice and peace process, admitted his guilt, his concession and plea of guilty is accepted, and his sentence will be wrapped up together with his conviction on these other drug crimes. And if it's tied to a decedent in the case, that makes it relevant. But, Your Honor, the point – So the answer is yes. The answer is yes, but that's not the evidentiary record here. I know that. I know, but what this panel needs to do is decide whether the judge abused his discretion in finding that six pages out of 1,170, which does not have any factual findings and is not a final judgment, was an abuse of discretion under 80322. I think you are exactly right about that. But if you lose on the big issue, and this case goes back for trial, there's a chance that a lot of some of these evidentiary problems could be rectified. And that's why Judge Karnes asked the question of your opposing counsel earlier about whether we need to go in and figure out the evidentiary issues in this case because they affect not just these bellwether plaintiffs, but all the thousands of cases if something goes back for trial. So you could have a ruling, in other words, that says, on this record, the district court did not abuse his discretion in excluding this evidence under this document under 80322 for these reasons, including the fact that the document presented was incomplete, didn't show this, didn't show that. And then you could drop a footnote to say we express no opinion on whether or not the document, if introduced completely, all 1,100 pages, would be admissible under 80322. I think that's the correct decision here. Okay. Absolutely, Your Honor. But you have to decide the case based on the record before you. Of course we do. Everybody knows that. And, you know, it's curious that the plaintiff's only submitted six pages of 1,170. As an advocate, I'd like to see those other pages. They're available for you, aren't they? Well, they're available on a website with no authentication. Have you looked at them? They're in Spanish, but we've tried to understand. Of course you have. Any good lawyer would look at them. Okay. I think Judge Carnes had a question for you. Yeah, counsel, I do. This is not a bellwether case. These are 12 bellwether cases that have been consolidated for our consideration purposes. I want to ask you this question, and I think I know what your answer is. After I phrase the question, let me tell you why that answer is not going to help. I want to ask you, which of the 12 bellwether plaintiffs have the strongest case? Which of them have the weakest case? And I know your lawyerly instinct is to say, oh, all of them are so incredibly weak, you can't distinguish between them. If you do that, and we pick one of them, which turns out to be the strongest case, and we find that summary judgment shouldn't have been granted against that particular bellwether plaintiff, then the next step is going to be, and as defense counsel conceded at oral argument, they all rise and fall together because they're all equally strong or weak. Therefore, we reverse as to all of them. Now, with that preface, which ones are the weakest and why, and which ones are the strongest? You can do the weakest, and we'll figure the rest of them are the strongest if you want to. Judge, they don't all rise or fall.  But they're similar in that in each instance they try to establish their case with layers of hearsay. None of which can be accepted. You're doing what I warned you against doing, which is to say that they're all terribly weak, and I can't distinguish between them. You better distinguish between them because if you don't, the temptation, which we may or may not succumb to, will be to say, let's take one example and tell you why summary judgment shouldn't have been granted, and now counsel said they all rise and fall together, and therefore they're all reversed. So tell me the weakest ones and why, if you will. Let me be clear, Judge. They don't all rise or fall together. They all have different pieces of evidence that they submitted to the trial court. All of that evidence in each case for different reasons. First of all, it's all hearsay and layers of hearsay, and the district court judge painstakingly looked at each piece of evidence and ruled whether it met a present sense impression exception or an excited utterance exception or an 8036 exception or 8038 or whether someone had personal knowledge. And for different reasons in each case, for multiple reasons, Your Honor, he made the determination within his zone of choice. So I'm sorry, but this is like two minutes worth of wind-up to, I hope, what is the answer to Judge Karn's question. Judge, I've not evaluated the cases to say which is the weakest and which is the strongest. What we did is go through each case, weigh the evidence, and made our arguments that none of them could proceed past summary judgment because they were riddled with hearsay and other inadmissible evidence. But for different reasons. You understand your phrase gives away your position. We went through it and weighed the evidence. We always saw, at least I did, speaking only for myself, that that was the function of the jury. Well, Judge, excuse my misspeak. When I say weighed the evidence, we considered the evidence, and as I said earlier, just like the trial judge, we considered whether plaintiff's argument that layers of hearsay and other admissible evidence met a hearsay exception and made the determination, we made the argument that it did not. Can I emphasize one more thing? Most of the case the plaintiffs present is based on hearsay. It's very, very important that the hearsay rules be enforced because unless they are, we as defense counsel have no ability to cross-examine the out-of-court defendant. We have no ability to test his or her veracity, no ability to subject them to cross-examination and find out what the truth is. That's the real problem here. And that's why the judge so meticulously and carefully weighed in each individual case, Judge Carnes, whether the various exceptions applied. Counsel, you've answered my question, which is counsel was asked which one was the weakest case, and he doesn't know or couldn't say, and therefore we'll make that determination if any ourselves. Yes, and I would urge you to do it on a case-by-case basis. Yes, sir. All right, Mr. Cioffi, we've taken you way beyond your time, but we thank you for your assistance and your answer to our questions. Thank you, Your Honor. Mr. Wolfe, you've got your two minutes. Thank you, Your Honor. I just have a couple points. First of all, the Justice and Peace Commission, that is a real court. It's organized under the Colombian government's fiscalia, which is the office of the attorney general. It's worth noting that in Colombia, they have a continental system based on the European legal systems, a civil law system that mixes the role of judge and prosecutor. So when you have something like a letter from a prosecutor, that is correspondence from the court. And in addition to the sentencia and to the indictment that Mr. Hoffman has been describing, I want to point out another similar piece of evidence, which can be found in my appendix at pages 211 to 212, and that's a letter that the plaintiff receives from the prosecutor stating that, in this case, Raul Hezbollah, the saying witness, consents to the murder on a particular debate. But a letter is different. The letter is not the same sort of thing as a public document or a judgment of conviction, Mr. Wolf, right? That is correct. You normally can't introduce letters for the truth of the matter stated in those letters, because I think Mr. Cioffi is right that that's just absolute hearsay, right? Well, we think that they can be introduced as business records, because the motive of the prosecutor or the judge, prosecutor, judge, is certainly not to confuse the cases, to keep accurate records and make sure that the cases are decided, and that the plaintiffs or the victims in those cases are notified of the results of the criminal proceedings. The second point I want to make, there's been a lot of discussion about page 64 of the opinion and the statistics, but those are very misleading in the way that they're presented, because it describes the murders from 1980 to 2012. That's a 30-year period. And the operations of the AUC and how they took control of the war in the guerrillas is very well known. And finally, to understand this case in proper context, the summary judgment standard is based on three cases, Stellatex, Matsushita, and Anderson v. Liberty Lobby. It's worth taking a look at those cases, because they're all about circumstantial evidence, and the burden really shifts, and the defendant will have to show some reason why it's not plausible and reasonable, the theory that the plaintiffs are presenting. All right, Mr. Wolfe, thank you very much. Okay, Mr. Hoffman, you've got five minutes. Thank you, Your Honors. I just wanted to emphasize, and I think it's pretty obvious from my opposing counsel's presentation, that Chiquita just ignores all the evidence in the record that was not excluded, and that there's plenty in order to get to a jury. And I would like to point out a couple of things that have come up. Before you do that, Mr. Hoffman, let me ask you a question. Did either side present evidence under Rule of Civil Procedure 44.1 on foreign law, that is, Colombian law, with regards to the justice and peace process in Colombia? Yes. In fact, Professor Sanchez's declaration, which presents the court with the formal justice and peace law and explains how the law works and explains the significance of the has-been indictment, the Record 138, and that's quintessential Rule 44.1 testimony about foreign law. Do you happen to know the appendix or record citation to that declaration for Sanchez? Yes, I do. It's at Appendix 7389. Okay, thank you. And he attaches as Exhibit 1 the justice and peace law. He explains how it operates. He explains the fact that every one of these proceedings is based on a confession and a verification of the fact that the AUC was responsible for the crimes that are either indicted or in a sentencia. And, yes, I think as the court knows, under Rule 44.1, this court can use the benefit of Professor Sanchez's learning in terms of understanding that process. Okay. Go ahead with the rest of your argument. Should I go on with you? You've got a couple of minutes. The other point that I wanted to make is that I don't think any fair reading of the judge's decision indicates that he excluded the other portions of Professor Kaplan's expert report. I think he excluded his particular opinion. And even more important, there are two other experts that were not excluded at all, Professor Karl and Professor Kirk. And Professor Kirk is probably one of the leading scholars and reporters of the civil strife in Colombia over the years. And I'm not even sure the defendants objected to most of her expert declarations. She talked about the way the AUC was formulated, the control, the domination, the way they worked, their methodology, the manner in which they killed. And in her testimony, and they took her deposition, she went to Colombia at least twice a year between 1997 and 2005 to do an in-person investigation, interviews. And the same is true of Professor Kaplan. He looked at sentencias. He looked at the interviews that AUC commanders gave. There's a multitude of evidence. It wasn't just the overlap between temporal and geographic. The other point on modus operandi is that the judge made a legal error on modus operandi that I'm not even sure the defendants try to defend anymore. The 404B doesn't apply when you're talking about the modus operandi of a third party. 404B only applies to a criminal defendant, and that's to protect the criminal defendant from prejudice. The modus operandi evidence is obviously highly probative. There's lots of evidence about the modus operandi of the AUC. It should not have been categorically excluded, and it was excluded based on a legal error, which is an abuse of discretion. The judge should have allowed that in to the extent he rejected it, and the jury should be entitled to weigh that evidence and decide whether the circumstances of these murders meet the AUC's modus operandi in the context of their control and domination and all the other evidence that was in front of the court. This warring faction canard, yes, Columbia has been riven by civil strife for many decades, but the evidence that the plaintiffs introduced was that the AUC dominated these regions, these localities at this time, killed people in this manner, and that that's more than enough for a jury to decide and weigh that evidence. Defendants are clearly able to get up and say, how would anybody know what's going on in the fog of war and try to introduce evidence? But our evidence, which has to be taken in the light most favorable to us, is that the AUC, it's more likely than that that the AUC was responsible for these murders. And the judge was able to make an error in granting summary judgment. And I thank you for the time that you've given me to explain our position. Okay, Mr. Hoffman. Thank you, Mr. Wolff. Thank you, Mr. Chofie. Thank you. We'll take the case under advisement. We're going to hear our second case now, so take your time.